1   KENDALL BRILL & KELLY LLP
    Richard B. Kendall (90072)
2     *rkendall@kbkfirm.com*
    Randall L. Jackson (244545)
3     *rjackson@kbkfirm.com*
    10100 Santa Monica Blvd., Suite 1725
4   Los Angeles, California 90067
    Telephone: 310.556.2700
5   Facsimile:  310.556.2705

6   Attorneys for Plaintiff and Counterdefendant
    Viacom International Inc.

7

8              **UNITED STATES DISTRICT COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

11  VIACOM INTERNATIONAL INC.,          Case No. 2:15-CV-09621-R (Ex)
    a Delaware corporation,
12                                      **DECLARATION OF SARAH LEVY**
                Plaintiff,              **IN SUPPORT OF PLAINTIFF**
13                                      **VIACOM INTERNATIONAL**
            v.                          **INC.'S MOTION FOR SUMMARY**
14                                      **JUDGMENT**
    MGA ENTERTAINMENT, INC.,
15  a California corporation,           *Filed concurrently with Memorandum*
                                        *of Points and Authorities; Separate*
16              Defendant.              *Statement; Declarations of Thomas*
                                        *Horner, Sujata Luther, Alexandra*
17                                      *Whelan, Jennifer Jankowski, Justin*
                                        *Halliley, and Randall Jackson*
18

19  MGA ENTERTAINMENT, INC., a
20  California corporation,             Judge:  Hon. Manuel L. Real
                                        Date:   July 18, 2016
21              Counterclaimant,        Time:   10:00 a.m.
                                        Crtrm.: 8
22          v.

23  VIACOM INTERNATIONAL INC., a
    Delaware corporation; DOES 1-10,
24  inclusive,

25              Counterdefendants.

26

27

28

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

## DECLARATION OF SARAH KIRSHBAUM LEVY

I, Sarah Kirshbaum Levy, declare as follows:

1. I am the Chief Operating Officer of the Viacom Kids & Family Group. In my position as Chief Operating Officer, I am responsible for the finance, strategic planning, and business operations of Nickelodeon. I have personal knowledge of the facts set forth herein. If called as a witness, I could and would competently testify to the matters stated herein.

2. Nickelodeon and Nick Jr. are two channels that are operated through Viacom International Inc. ("Viacom"). Nickelodeon targets children aged 2-11. Nick Jr., by contrast, targets preschool children exclusively. Nickelodeon has a "block" of preschool programming as well, which is sometimes referred to as the "Nickelodeon Preschool Block" or as "Nick Jr." During the school year, programs that are part of the Nickelodeon Preschool Block are broadcast during the week between about 8:30 a.m. and 2 p.m. During the summer, when older kids are out of school, the Nickelodeon Preschool Block is shortened.

3. Programming on the Nick Jr. channel is designed for preschoolers. Popular Nick Jr programs from 2012 to the present include shows such as *Dora the Explorer* and *Peppa Pig,* which are aimed at preschool-aged children.

4. Based on my long experience working with advertisers and toy companies, I can state that it is commonly known to anyone in our industry that a program suitable for broadcast on "Nick Jr." (whether on the Nickelodeon Preschool Block or the separate Nick Jr channel) is a program targeted to preschoolers.

5. Since 2012, I have had substantial involvement in the Lalaloopsy television series, which is based on a brand of dolls created by MGA Entertainment, Inc. ("MGA"). From the beginning, based on its evaluation of the series, Viacom believed that Lalaloopsy would be part of Viacom's lineup of preschool-oriented programming. Viacom communicated this view to MGA, and MGA acted

281481.2

1 throughout the development of the series and its broadcast as if Lalaloopsy was a
2 program targeted at preschoolers.

3     6.     Viacom believed that this was a preschool-oriented program based on
4 creative material (such as preliminary scripts) about the television series that MGA
5 and its producer, Moonscoop, supplied to Viacom when Viacom first began to
6 seriously contemplate an agreement to broadcast the program. Based on the
7 information provided by MGA, Viacom assigned Teri Weiss, Nickelodeon's EVP of
8 Preschool Production and Development, as the lead creative executive for the
9 program. Ms. Weiss worked with MGA and Moonscoop in the development of the
10 series and offered guidelines with a focus on attracting preschoolers. (Attached
11 hereto as Exhibit A is a true and correct copy of email correspondence reflecting
12 some aspects of Ms. Weiss' involvement.) Viacom also provided MGA with
13 Nickelodeon's production guidelines for preschool programs.

14     7.     When the Lalaloopsy program was first shown on Nickelodeon, the
15 program was broadcast during the Nickelodeon Preschool Block. The Lalaloopsy
16 series debuted on Nickelodeon on March 29, 2013, and it remained in the
17 Nickelodeon Preschool Block through June 14, 2013, during which time
18 approximately a dozen episodes of the series were premiered. While in the
19 Nickelodeon Preschool Block, Lalaloopsy was typically broadcast during the week
20 at 1:30 p.m.

21     8.     Viacom transferred Lalaloopsy from Nickelodeon to the Nick Jr.
22 channel as of June 17, 2013. This decision was made because the series' overall
23 ratings were inadequate for programs in the Nickelodeon Preschool Block (in
24 particular, Lalaloopsy was unable to garner a "5" rating among kids aged 2-5), the
25 series skewed too heavily toward girls (causing boys to abandon the network), and
26 the series had poor lead-in and lead-out retention (that is, Lalaloopsy lost viewers
27 from its lead-in program, and failed to hold onto enough viewers for the next
28 program). Lalaloopsy also performed worse than its predecessor, *Dora the*

281481.2     2

1  *Explorer*, in the same 1:30 p.m. timeslot. Moreover, the show was moved to Nick
2  Jr. when Nickelodeon's Preschool Block shortened for the summer.

3       9.     When Viacom advised MGA of this decision, MGA did not assert that
4  Viacom was contractually obligated to continue to broadcast the show on
5  Nickelodeon. Nor did MGA indicate that it believed that the series was targeted at
6  children older than preschoolers.

7       10.    On Nick Jr., Viacom provided Lalaloopsy with many of the best
8  timeslots. While specific timeslots for the series would change on occasion, the
9  program was regularly shown multiple times per week at the same time each day.
10  Ultimately, Viacom broadcast all 52 episodes of the Lalaloopsy series and broadcast
11  the series for a period of at least three years. In total, the show has been broadcast
12  on approximately 1,700 occasions.

13       11.    Viacom went to great lengths to maximize Lalaloopsy's performance
14  through its promotional efforts. Before the series even debuted, Viacom broadcast
15  promotional advertisements for Lalaloopsy on both the Nickelodeon and Nick Jr.
16  channels, and launched an online campaign in support of Lalaloopsy.

17       12.    After Lalaloopsy's initial broadcast, Nickelodeon and Nick Jr both
18  provided meaningful on-air promotion for the series (*e.g.*, notifications to viewers as
19  to when the next Lalaloopsy premiere would be broadcast). In addition to on-air
20  promotion, Viacom broadcast numerous Lalaloopsy "specials," despite the absence
21  of any contractual obligation to do so, and without requiring the payment of any fee
22  by MGA. Viacom likewise promoted those specials to the extent feasible, and also
23  did its best to broadcast these specials in the timeframes requested by MGA. On
24  areas of the Nick Jr. website and the Nick Jr. "app" that are dedicated to Lalaloopsy,
25  Viacom made available certain episodes of the Lalaloopsy series (consistent with
26  the availability of episodes for other preschool programs) as well as short form
27  videos. Additionally, Viacom spent approximately $50,000 on a digital online game
28  called the "Lalaloopsy Friendship Parade" that is available on the Nick Jr. website.

281481.2

3

1  Moreover, Viacom created a dedicated "Nickshop.com" page for Lalaloopsy, and
2  Viacom assisted with other promotional events for the Lalaloopsy series, such as at
3  the Nick Hotel and at the Mall of America. Finally, episodes of the show could be
4  purchased online through iTunes and other transactional on-demand platforms (like
5  the Google Play Store).

6      13.   The parties' contractual relationship with respect to the Lalaloopsy
7  series is governed by a Series Co-Financing Agreement dated as of October 9, 2012
8  (the "Co-Finance Agreement"). A true and correct copy of the Co-Finance
9  Agreement is attached hereto as Exhibit B. Under the Co-Finance Agreement,
10 Viacom was entitled to receive $9 million in minimum guarantee payments over
11 three years, which were recoupable against certain revenue streams defined in the
12 agreement, including the sale of Lalaloopsy dolls. Ultimately, MGA's sales were
13 insufficient for Viacom to participate in these revenue streams, and Viacom was
14 limited to receiving the minimum guarantee payments themselves. Pursuant to
15 paragraph 7(d) of the Co-Finance Agreement, MGA was required to make the final
16 $4 million minimum guarantee payment to Viacom no later than September 15,
17 2015. MGA has only paid $500,000 toward this obligation to date, and has failed to
18 pay the remaining $3.5 million.

19     I declare under penalty of perjury under the laws of the United States of
20 America that the foregoing is true and correct.

21     Executed on this 17th day of June, 2016, at New York, New York.

22

23

24                                              Sarah Kirshbaum Levy

25

26

27

28

281481.2                          4

# Ex. A

| **To:** | Kirshbaum Levy, Sarah[Sarah.Levy@nick.com] |
|---|---|
| **From:** | Drew, Jamie |
| **Sent:** | Thur 4/26/2012 7:10:36 AM |
| **Importance:** | **Normal** |
| **Subject:** | Re: Lalaloopsy |

Totally agreed!!

**From**: Kirshbaum Levy, Sarah
**Sent**: Thursday, April 26, 2012 07:08 AM
**To**: Drew, Jamie
**Subject**: Re: Lalaloopsy

Tis is great.  She's really impressive.

On Apr 25, 2012, at 9:33 PM, "Drew, Jamie" <Jamie.Drew@nick.com> wrote:

Sarah,
Here is the update from Teri on the creative conversation w/ MGA. I can fill you in
tomorrow if you dont want to read this entire chain, but if you're interested, start at
the bottom.

Thanks!

_____

**From:** Weiss, Teri
**Sent:** Wednesday, April 25, 2012 8:59 PM
**To:** Drew, Jamie
**Cc:** Wilson Stallings, Kay
**Subject:** RE: Lalaloopsy

I think it could be adorable.  I do think there are opportunities to make this series fit
with our brand, and if the deal make sense for us financially, we will make every
effort to help them deliver a great show.

They did seem to want the series on air for pre-Easter sales, and if this is critical to
the deal, we should discuss internally how we manage this with our Peter Rabbit
launch in Spring.  I'm sure we can figure out how to do both, I just want to make sure
you were aware.

CONFIDENTIAL

VIA00045475

Also forgot to mention that we also discussed partnering with them on their digital content.   I think it is important that as soon as our brand is linked to theirs, that content reflects the Smart Place to Play positioning as much as possible.  James and his group i'm sure would be very helpful.

Also, when the deal is done, we should pow wow with Dan Martinsen to discuss how we position our partnership with press and how it fits into our portfolio.  I have ideas, but want him to be on board.

---

**From:** Drew, Jamie
**Sent:** Wednesday, April 25, 2012 8:14 PM
**To:** Weiss, Teri; Wilson Stallings, Kay
**Subject:** RE: Lalaloopsy

Teri,
Thanks so much for this information! It sounds like the call was very productive and they seemed open to your input. Assuming MGA makes these creative changes, do you think this series is a fit with our brand/preschool portfolio? Would you be excited to pursue this partnership?

Thanks!
Jamie

---

**From:** Weiss, Teri
**Sent:** Wednesday, April 25, 2012 6:33 PM
**To:** Drew, Jamie; Wilson Stallings, Kay
**Subject:** RE: Lalaloopsy

Hi Jamie

The creative conversation went well- we met with Casey as well as the MoonScoop creative team that is currently working on the series.  Here was our top line feedback that they seemed very receptive to:

1.  Our team has had many creative partnerships with well-established IPs (such as Little Bear, Olivia, Max & Ruby) and our success with these projects has come from our long history of research with kids and our ability to bring TV expertise to the table.  Our goal is provide the best creative feedback that supports the essence of their property and at the same is true to the

Ex. A   Page 6

VIA00045476

Nickelodeon brand.

2. Along those lines, Lalaloopsy needs to fit into the Nick Jr portfolio and be able to deliver on our positioning, "the Smart Place to Play."  So we advised them to hire an educational consultant that can take themes like Friendship, Empathy, Conflict Resolution and form a pro-social curriculum to be used by their team of writers to inform stories and character development.  There were hints of these themes in some of the preliminary scripts we read, but a consultant can help strengthen these messages to kids and make their content more substantial.

3. They have hired Carin Greenberg as their story editor and we like her- she has worked on several Nick shows, and has done many educational series for PBS, such as Between the Lions.  They are open to us suggesting additional writers as well.

4. We reviewed how we'd like the process to work in terms of creative input, and they seemed very open to our involvement at each stage.

5. We expressed our concern for the abundance of sugar/candy/chocolate in the LaLaLoopsy world,  and that every 'snack' break involved cookies or cakes, or that rockets were fueled by hot chocolate, etc.   They were very open to having their 'farmer' character have more of a voice and presence about healthy eating, and incorporating more vegetables and grains into the series overall.  There will still be the character, Crumb, that is a baker, but she will not be the only food supplier in the series.

6. We had extensive conversations about songs and music as a way to liven up the show and make it less talky.  It will also help define and differentiate the characters for the audience.

7.  While they are focusing on at least 8 main characters, which is a lot, they are going to limit the number of characters per episode so that we are not seeing all 8 all the time.   They are also introducing boy characters.

8. They were very open to our design notes about making the dolls' eyes more expressive.  While we understand that the buttons are signature to the design style, they agreed that it made it very difficult to follow who was talking and demonstrate emotions without real eyes, and so they are doing some design experiments to help with this.

All in all, i think we can make this work, but I do think an educational consultant on board is very important as we look to defend this series as part of our educationally-driven portfolio.  The press will attack us for turning a doll into a series as a way to make money, and the merits of this series for kids need to be clear.   I do think there are opportunities to tell good stories about friendship, individuality, empathy, and resolving conflict within a group, and we can help them get there.

Let me know if you need any other details from our end.

Regards,

Teri

CONFIDENTIAL

VIA00045477

**From:** Drew, Jamie
**Sent:** Wednesday, April 25, 2012 3:51 PM
**To:** Weiss, Teri; Wilson Stallings, Kay
**Subject:** Lalaloopsy

Hey Teri & Kay,
I know you are both out of the office today, but I was hoping to get your thoughts on how the creative conversation went w/ MGA. I'm speaking to Casey tomorrow about the deal, so would love to get your topline thoughts in advance.

Thanks!
Jamie

Ex. A   Page 8

CONFIDENTIAL

VIA00045478

# **Ex. B**

Viacom Media Networks ("VMN") /MGA Entertainment ("MGA")
(each a "Party" and collectively ,"Parties")
Series Co-Financing Agreement

Dated as of: October 9, 2012

| 1.Property | "Lalaloopsy", a property created, owned and controlled by MGA, and all underlying rights, concepts, characters, designs, elements and/or materials now or hereafter created in connection therewith ("Property"). |
|---|---|
| 2. Production & Financing Commitment | (a) The Parties commit to co-finance a 2D Flash animated television series consisting of a minimum of 52 half-hour episodes based on the Property, collectively "Episodes" or "Programming". The Episodes shall each be approximately 22 minutes in running time (including opening and closing credits). |
| | (b) The Parties will have mutual budget approvals over the production budget for the initial 52 episodes of the Programming (and the budget(s) for subsequent cycle(s), if any), with a cost per episode of $267,112 for the initial 52 episodes of the Programming and increasing by 5% per additional cycle, if any. VMN and MGA shall co-finance all production of the Programming, with VMN's contribution capped at $100,167 per episode (i.e. 37.5% of the mutually agreed budget for the initial 52 episodes), said per-episode VMN contribution increasing 5% per cycle (but not more than 37.5% of the applicable budget), if any, following the initial 52 episodes. VMN will make its aforesaid contribution on a "cash flow" basis during the production of the Episodes in accordance with a cashflow to be furnished by MGA and approved by VMN (not to be unreasonably withheld or delayed), it being acknowledged and agreed that VMN's contribution will be made over the course of production of the Episodes with an initial payment made at the time of execution of this Agreement of $832,129 of the approved budget, provided, however, a final payment of 10% of the approved budget will be made upon delivery and acceptance of all of the episodes of the applicable cycle. |
| | (c) MGA in conjunction with Moonscoop (or such other third party production company mutually approved by the Parties) will be responsible for producing the Programming, with VMN having creative input and customary broadcaster approvals (as provided in paragraph 9 below). As between VMN and MGA, MGA will be responsible for all overages in connection with production of the Programming, except for overages caused by requests, changes and/or additions made by VMN in writing and not previously contemplated by the approved budget. MGA and VMN will split underages, if any, in accordance with their relative contribution to the production budget for the applicable cycle. MGA and VMN shall mutually approve any union or guilds engaged on the Programming. The Parties hereto agree that the voiceover services shall be rendered pursuant to an agreement (the "CLAC Agreement") between Health Care Service Employees Union ("CLAC") Local 301 and Chinook Animation Productions Ltd., a subcontractor of MGA. In connection with the foregoing, MGA represents and warrants that VMN shall have the benefit of all rights set forth in said CLAC Agreement as well as individual agreements with the voiceover talent, which shall in any event be no less favorable to VMN than the terms set forth in Exhibit A attached hereto. If requested by VMN, MGA agrees to use good faith efforts to secure additional promotional rights for VMN pursuant to the CLAC Agreement (at VMN's expense, if said rights are approved by VMN) and, if applicable, individual talent agreements, consistent with VMN's promotional uses. If, with respect to voiceover talent whose services are to be rendered after September 30, 2013, the CLAC Agreement cannot be renewed on terms at least as favorable to MGA (and therefore, VMN) as set forth on Exhibit A attached hereto, MGA will so notify VMN in writing, and in such event, the applicable union or guild (as well as the relevant terms of the collective bargaining agreement applicable to the voiceover talent) will again be subject to the mutual approval of MGA and VMN. |
| 3.Territory | "USTP/CB Territory" means: the United States (including its territories and possessions, including without limitation Puerto Rico and the US Virgin Islands); and the Caribbean Basin (which shall be |

619071v2

Ex. B   Page 9

| | |
|---|---|
| | defined as Anguilla, Antigua and Barbuda, Aruba, The Bahamas, Barbados, Bermuda, British Virgin Islands, Caribbean Netherlands, Cayman Islands, Curacao, Dominica, Grenada, Guadeloupe, Martinique, Montserrat, Saint Barthélemy, Saint Kitts and Nevis, Saint Lucia, Saint Martin, Saint Vicent and The Grenadines, Saint Maarten, Trinidad and Tobago, Turks and Caicos Islands). The world outside of the USTP/CB Territory is sometimes referred to herein as the "ROW". Spanish language rights in the Caribbean Basin and in Puerto Rico (with respect to satellite delivery) are on a non-exclusive basis. |
| **4.VMN Rights** | (a) Exhibition/Distribution Rights on Nickelodeon-Branded Services and Platforms: VMN hereby has the exclusive right to exhibit, distribute and exploit the Programming and any "Additional Production" (as defined below), and any excerpts thereof in the USTP/CB Territory in all languages (except that such rights are non-exclusive in the Spanish language in the Caribbean Basin and in Puerto Rico [with respect to satellite delivery]) in perpetuity on any Nickelodeon-branded content distribution service (whether now existing or subsequently acquired and/or launched) by means of all linear and non-linear media (whether now known or hereafter developed or discovered) including without limitation via all forms of television; all forms of video-on-demand (e.g, without limitation, subscription video-on-demand ["SVOD"]) ; the Internet/online; wireless/mobile devices and platforms; and all successor platforms and technologies of all of the foregoing. Exhibition and/or distribution via Nickelodeon-branded content distribution services shall be without restriction as to device, method of delivery or subscriber and/or end user. VMN agrees to exercise said rights in accordance with the restrictions set forth in Exhibit A, to the extent said restrictions are and remain part of the CLAC Agreement.

(b) Exhibition/Distribution Rights on Third Party Services and/or Platforms: VMN hereby has the exclusive right to exhibit, distribute and exploit the Programming and any Additional Production that VMN finances or co-finances pursuant hereto (and any excerpts thereof) in the USTP/CB Territory in all languages (except that such rights are non-exclusive as to the Spanish language in the Caribbean Basin and in Puerto Rico [with respect to satellite delivery]) in perpetuity on third party services and/or platforms by means of all linear and non-linear media (whether now known or hereafter developed or discovered) including without limitation all forms of syndicated program sales; home entertainment (including without limitation home video/DVD/DTO/DTR/EST); all forms of video-on-demand (including, without limitation, SVOD [e.g., without limitation, Netflix]) and all successor platforms and technologies of all of the foregoing without restriction as to device, method of delivery or subscriber and/or end user. The foregoing rights set forth in this paragraph 4(b) may be exploited by VMN following the exhibition of the first episode of the Programming on the main Nickelodeon channel pursuant to the Programming Commitment (except for exhibitions on said third party services and/or platforms for promotional or "sneak peek" purposes, which may be exhibited prior to exhibition of said first episode).

The rights set forth in 4(a) and 4(b) above shall herein sometimes collectively be referred to as the "VMN Rights".

(c) With the exception of (i) Programming clips and Additional Production clips for promotional purposes (not to exceed 2 minutes in length for each such promotion and subject to the terms of paragraph 8 below); (ii) the "MGA Webisodes" on the "MGA Websites" (as said terms are defined in and subject to the terms of paragraph 6(b) below); and (iii) the right of Lions Gate Films Inc. ("LGF") pursuant to the "LGF Agreement" (as defined herein) to distribute certain home video and other digital distribution rights (but not, without limitation, linear television distribution rights) in and to (A) the direct-to-video productions, "Lost in La La Loopsy Land" and "Lala-Oopsies: A Sew Magical Tale" (the "LGF Pictures") and (B) certain direct-to-video productions that are "Subsequent Productions" (as defined in, and subject to the terms of, the LGF Agreement), MGA will not exhibit, distribute or exploit, nor authorize any third party to distribute, exhibit or exploit, the Property, the Programming and/or any Additional Production (except as specifically set forth to the contrary in paragraph 10 below regarding Additional Production), or any excerpts thereof, or any derivative or subsequent versions of any of the foregoing, in any linear or non- |

619071v2

Ex. B  Page 10

linear media (including without limitation the examples of linear and non-linear media set forth in paragraphs 4(a) and 4(b) above ) in the USTP/CB Territory, in perpetuity, it being agreed that VMN's rights herein as to the Programming and any Additional Production that VMN finances or co-finances are exclusive as against MGA and any other parties in said linear and non-linear media, in all languages in perpetuity, in the USTP/CB Territory (except Spanish language rights are non-exclusive in the Caribbean Basin and in Puerto Rico [with respect to satellite delivery]). As used herein, the "LGF Agreement" means the agreement, dated as of July 26, 2011, between MGA and Lions Gate Films Inc., as amended as of June 19, 2012.

(d) VMN hereby has exclusive, consecutive, dependent options to co-finance additional cycles of series episodes (in groups of 26 episodes per cycle) based on the Property and/or the Programming ("Additional Seasons") on the same terms and conditions set forth herein, except that the per-episode budget for each additional cycle of such series episodes shall increase 5% per cycle (unless otherwise mutually agreed by the Parties in writing) and each cycle pickup shall be for 26 episodes (as opposed to 52 episodes). In connection with the foregoing, VMN's financial contribution will increase 5% per cycle (but not to exceed 37.5% of the applicable budget). Each such option shall be exercisable by written notice on or before the date that is 6 months after final delivery and Company's acceptance of the immediately prior cycle's last episode (or, if first cycle's first episode premieres [excluding "sneak peeks"] during the last 3 of those 6 months, then instead on or before the date that is 3 months after that premiere. If VMN elects not to co-finance any Additional Seasons and said Additional Seasons are co-financed by a third party, then VMN's right to co-finance and/or exploit subsequent Additional Seasons immediately terminates. If VMN wishes to co-finance said additional cycle(s) of series episodes but MGA does not, VMN may go forward without MGA, subject to the terms of paragraph 10 below.

(e) Provided VMN has not forfeited "VMN's First Negotiation/First Refusal Rights" (as defined below) pursuant to, and subject to the terms of, paragraph 11(b) below, if MGA wishes to produce a derivative production based on the Property (but as to the Property, subject to LGF's right of first negotiation as to certain direct-to-video productions that are Subsequent Productions, in accordance with and subject to the terms of the LGF Agreement) and/or the Programming and/or Additional Production financed or co-financed by VMN (including sequels, prequels, theatrical motion pictures and direct-to-video productions) ("Derivative Productions"), then VMN will have a right to co-finance each such Derivative Production, subject to good faith negotiations between the parties for a period of 45 days, but in any event on terms no less favorable to VMN than the terms of this Agreement if the Derivative Production is a television series). In the event that the parties have not reached agreement after good faith negotiation on the material terms of such engagement within such 45 days following the commencement of such negotiations, MGA is free to negotiate with others to co-finance any such Derivative Productions; provided that, if MGA proposes to accept material terms for such co-production that are less than or equal to what VMN last offered to MGA in writing, then VMN shall have a 10 calendar day (excluding holidays and the period from and including December 15th through and including December 31st of each year) right of "first refusal" to match such terms. If MGA does not accept such third party offer, the first refusal provisions of this paragraph shall continue to apply to any offers with respect to such rights. In addition, VMN shall have changed elements protection, so that if there are changed elements (including without limitation as to deal structure) as to any proposal that MGA and VMN previously negotiated, then VMN's right of first negotiation/first refusal shall continue to apply to said proposal with said changed elements. All of the first negotiation and first refusal rights set forth in this paragraph 4(e) are herein referred to as "VMN's First Negotiation/First Refusal Rights". If VMN elects not to co-finance a Derivative Production and said Derivative Production is co-financed by a third party, or if prior to VMN's "first negotiation" or "first refusal" right VMN elected not to co-finance any Additional Seasons per paragraph 4(d) above and said Additional Seasons are co-financed by a third party, then VMN's right to co-finance subsequent Derivative Productions immediately terminates.

619071v2

Ex. B  Page 11

CONFIDENTIAL

|  | Notwithstanding the foregoing, if VMN does not finance a Derivative Production because such Derivative Production is a direct-to-video production for which LGF has a right of first negotiation pursuant to, and subject to the terms of, the LGF Agreement, then VMN's rights to co-finance subsequent Derivative Productions shall not terminate. MGA agrees that it will not develop or produce, or cause to be developed or produced, a direct-to-video production that is both a derivative production to (i) the Programming and/or Additional Production; and (ii) one or both of the LGF Pictures. It is specifically agreed and understood that direct-to-video productions based on the Programming and/or Additional Production financed or co-financed by VMN (i.e. such direct-to-video productions (A) contain characters, names, storylines, designs, titles, artwork, animation style or other elements that are original to the Programming or said Additional Production financed or co-financed by VMN and that did not previously appear in the Property, or (B) are spinoffs, sequels, prequels or remakes to said storylines or such other original elements) shall not be subject to LGF's rights as to Subsequent Productions pursuant to the LGF Agreement (or otherwise). Derivative Productions, together with Additional Seasons, shall herein collectively be referred to as "Additional Production". |
|---|---|
| 5.Program-ming Commitment | VMN hereby commits to launch the series on the main Nickelodeon channel (such launch plan to be developed in meaningful consultation with MGA) and thereafter broadcast the Programming on either the main Nickelodeon channel or the Nick Jr. channel on a regularly scheduled basis during the hours 8 a.m. to 9 p.m. for three years (subject to customary resting periods, which shall not be longer than 3 consecutive months). Subject to timely delivery (as provided in paragraph 12 below) and acceptance of the Episodes hereunder, VMN intends to commence broadcasting the Programming no later than March, 2013. The foregoing programming commitment is herein referred to as the "Programming Commitment". The one-year period commencing upon exhibition of the initial episode of the Programming shall herein sometimes be referred to as "Year 1" of the Programming Commitment. The consecutive 12 month period immediately following Year 1 shall herein sometimes be referred to as "Year 2" of the Programming Commitment and the consecutive 12 month period immediately following Year 2 of the Programming Commitment shall herein sometimes be referred to as "Year 3" of the Programming Commitment. If VMN exercises its option to co-produce episodes 53-78 of the Programming, then the 12-month period immediately following Year 3 of the Programming Commitment shall herein sometimes be referred to as "Year 4". |
| 6.MGA Rights | MGA Ancillary Rights: (a) MGA hereby has the exclusive ancillary rights to the Programming and all Additional Production that are financed or co-financed by VMN (other than VMN's promotional rights in and to the Programming and such Additional Production, including without limitation the right to create and exploit promotional digital games) in the USTP/CB Territory, including, without limitation, all consumer products (including without limitation toys [including those toys that may embody audio-visual elements of 60 seconds or less in duration and/or non-linear and/or interactive elements], apparel, accessories); video games and their successor technologies on any platform or media; paid or free digital apps; publishing (print and electronic), music, live and themed entertainment, and recreation (collectively, the "Ancillary Rights"). MGA shall have all rights of every kind and nature whatsoever in and to the Property and Programming in ROW and in Additional Production financed or co-financed by MGA in ROW, it being agreed that if MGA does not co-finance an Additional Production that is financed by VMN hereunder, then VMN shall have the same rights (e.g., the VMN Rights, exclusivity protection, etc.) in ROW as are granted to VMN hereunder as to USTP/CB Territory.<br><br>(b) In addition to the foregoing, MGA shall have the right to exhibit ten (10) webisodes based on the Property on websites owned by, operated by and branded MGA (said webisodes, the "MGA Webisodes" and such websites, the "MGA Websites"). The initial exhibition of the MGA Webisodes shall be timed to support the Programming and shall be subject to mutual approval by MGA and VMN. |

CONFIDENTIAL                                                                                VIA00001523

| 7.Revenue Share | (a) Notwithstanding anything to the contrary herein, VMN will retain 100% of ad sales and all other revenue (e.g., without limitation, subscriber fees, affiliate fees and revenues, etc.) from exhibition and/or distribution of the Programming and any Additional Production on Nickelodeon-branded content distribution services and/or platforms (as said services and/or platforms are further provided for in paragraph 4(a) above). |
| --- | --- |
| | (b) Provided VMN has not forfeited the Royalty pursuant to, and subject to the terms of, paragraph 11 below, for all toy exploitation based on the Property and/or the Programming in the USTP/CB Territory, commencing upon initial broadcast of the first episode of the Programming hereunder, MGA will retain all revenues and shall pay VMN a toy royalty (the "Royalty") as follows: |
| | (i) For 52 episodes ordered, an amount equal to  (A) 4% of 100% of all gross wholesale revenues (less standard discounts and allowances capped at 10% of said wholesale revenues quarterly) actually received by MGA from exploitation in the USTP/CB Territory; and (B) 4% of 100% of all gross revenues (less standard discounts and allowances capped at 10% of said gross revenues quarterly) actually received by MGA from direct-to-consumer sales from exploitation in the USTP/CB Territory (if any),  in excess of $125 million of all such revenues (i.e. wholesale and direct-to-consumer revenues in the aggregate) per year; and |
| | (ii) If more than 52 episodes are picked up (i.e. if VMN exercises an option to co-finance an additional cycle of series episodes hereunder), then upon the later of (A) commencement of Year 4; or (B) such pickup and in lieu of the terms set forth in paragraph 7(b)(i) above, an amount equal to (A) 4% of 100% of all gross wholesale revenues (less standard discounts and allowances capped at 10% of said wholesale revenues quarterly) actually received by MGA from exploitation in the USTP/CB Territory; and (B) 4% of 100% of all gross revenues (less standard discounts and allowances capped at 10% of said gross revenues quarterly) actually received by MGA from direct-to-consumer sales from exploitation in the USTP/CB Territory (if any)  in excess of  $85 million of all such revenues (i.e. wholesale and direct-to-consumer revenues in the aggregate) per year. |
| | Royalty obligations shall accrue upon sale of the licensed products.  A licensed product is considered "sold" when it is invoiced, shipped or paid for, whichever event occurs first.  In the event that licensed products are sold to any party affiliated, controlled or in any way related to MGA at a special price lower than the average price charged to other parties, the Royalty payable to VMN shall be based upon said average price. |
| | (c) Provided VMN has not forfeited its participation in MGA Adjusted Gross Ancillary Revenues (as defined below) pursuant to, and subject to the terms of, paragraph 11 below, for all other MGA ancillary exploitation of the Property and/or the Programming (i.e. other than toy exploitation, which is covered in 7(b) above) in the USTP/CB Territory, commencing upon initial broadcast of the first episode of the Programming hereunder, MGA will retain all such revenues derived therefrom, except VMN will receive a backend participation in an amount equal to 30% of 100% of "MGA Adjusted Gross Ancillary Revenues". "MGA Adjusted Gross Ancillary Revenues" means all non-refundable gross revenues actually received and earned by MGA from exploitation of the Ancillary Rights in and to the Programming and/or the Property in the USTP/CB Territory less (i) a 20% distribution fee (inclusive of sub-distributor and sub-agent fees); and (ii) actual, verifiable out-of-pocket distribution expenses not to exceed 5% of gross revenues received by MGA, except the following expenses will be outside of the 5% cap: manufacturing and production expenses due to an ancillary use (and not the production costs to produce the Programming), residuals and reuse fees (which will be uncapped).  In connection with the foregoing, the Parties agree that MGA Adjusted Gross Ancillary Revenues shall not include the home video and other digital distribution |

Ex. B  Page 13

revenues received by MGA pursuant to the LGF Agreement with respect to such distribution of the LGF Pictures, provided, however, the MGA Adjusted Gross Ancillary Revenues shall include revenues from said productions in connection with exploitation of "Ancillary Rights" in and to said productions.

(d) Notwithstanding the foregoing or anything to the contrary herein, MGA hereby agrees to pay VMN the following minimum guarantees in the amount of (a) $2 million, $3 million and $4 million in Year 1, Year 2 and Year 3 of the Programming Commitment, respectively, totaling $9 million for said 3 years; and (b) if MGA elects to produce Additional Seasons and VMN co-produces such Additional Seasons, then MGA will pay VMN a minimum guarantee of $4.5 million for each such group of 26 episodes co-produced by VMN, all such minimum guarantees recoupable against the Royalty set forth in paragraph 7(b) above and the backend participation set forth in paragraph 7(c) above up to the applicable minimum guarantee amount. Such minimum guarantees shall not be cross-collateralized against revenues received in other years (e.g., without limitation, the minimum guarantee for Year 1 will not be cross-collateralized against revenues received in Year 2 or Year 3, etc., and the same principle applies to the other minimum guarantees). Said minimum guarantees shall be payable as follows: on September 15, 2013, September 15, 2014, September 15, 2015 and thereafter each consecutive September 15 of each subsequent year if MGA elects to produce Additional Season(s) and VMN has co-produced such Additional Season(s). MGA shall pay VMN the applicable minimum guarantee for the applicable year, less the total of the Royalty payments (as set forth in paragraph 7(b)) and VMN's share of MGA Adjusted Gross Ancillary Revenues backend participation (as set forth in paragraph 7(c)) previously paid to VMN in said applicable year (e.g., if broadcast of the Programming commences March 15, then any Royalty payments and VMN's share of MGA Adjusted Gross Ancillary Revenues paid to VMN between March 15 and September 15 of that year would be applied against the minimum guarantee otherwise due to VMN on September 15 for that year);

(e) For exploitation of the Programming on third party services and/or platforms in the USTP/CB Territory as provided in paragraph 4(b) above, VMN will retain all such revenues derived therefrom, except MGA will receive a backend participation in an amount equal to 25% of 100% of "VMN Adjusted Gross Revenues". "VMN Adjusted Gross Revenues" means all non-refundable gross revenues actually received and earned by VMN from exploitation of the Programming on said third party services and/or platforms in the USTP/CB Territory less (i) a 20% distribution fee (inclusive of sub-distributor and sub-agent fees); and (ii) actual, verifiable out-of-pocket distribution expenses not to exceed 5% of gross revenues received by VMN, except the following expenses will be outside of the 5% cap: manufacturing and/or production expenses (e.g., home video but not the production costs to produce the Programming) and residuals and reuse fees.

(f) VMN will allocate to gross revenues in its sole and reasonable discretion, revenues received pursuant to agreements that cover other projects in addition to the Programming (e.g., a Nickelodeon bundle on a digital distribution service) in a good faith, non-discriminatory manner consistent with industry standards. MGA acknowledges that such allocation requires the application of subjective factors.

(g) Each of VMN and MGA shall be responsible for payment of third party participation(s) from exploitation of its respective rights hereunder in the USTP/CB Territory, but only if said participation(s) have been mutually approved in writing.

(h) Each Party hereunder shall make accountings to the other Party (for MGA's share of VMN Adjusted Gross Revenues in the case of VMN, and for VMN's share of MGA Adjusted Gross Ancillary Revenues and the Royalty in the case of MGA) accompanied by any payments due to the other Party (such accountings shall be made even if payments are not due to the other Party), on a quarterly basis commencing with the first quarterly period following initial broadcast of the Programming hereunder, no later than 60 days

after the end of each quarterly period. The Parties shall each keep accurate, detailed and customary books of account and records relating to the exploitation of their respective rights hereunder. Each Party may, at their own expense and upon reasonable advance notice to the other Party, audit the other Party's books and records relating to the Property, Programming, Additional Production and the rights related thereto, with respect to the USTP/CB Territory, in order to verify statements rendered hereunder. Any such audit shall only be conducted by a reputable firm of certified public accountants during reasonable business hours at the audited Party's offices so as not to unreasonably interfere with the audited Party's normal business activities, and a true copy of any report(s) furnished to the auditing Party shall concurrently be furnished to the audited Party. Such right to audit is limited to the Property, the Programming, the Additional Production and the rights related thereto, and under no circumstances shall the auditing Party or the auditing Party's representative have the right to examine records relating to the audited Party's business generally, or with respect to any other projects, for purposes of comparison or otherwise. In no event shall an audit occur more than once per calendar year or continue longer than thirty (30) days. The records supporting any given statement may not be audited more than once. A Party's methods of treating any amount referred to in this paragraph for the Party's tax or financial purposes will have no bearing on the computation of VMN Adjusted Gross Revenues, MGA Adjusted Gross Ancillary Revenues or the Royalty. Each statement hereunder shall be deemed conclusive and binding unless a Party objects thereto by written notice to the other Party within two (2) years after the statement is issued, stating in detail the basis for the objection. The objecting Party shall be barred from bringing any legal proceeding in connection with such objection later than the expiration of the applicable statute of limitations established by law or two (2) years after the effective date of such written notice of objection, whichever occurs first.

(i) Without limitation to the foregoing and in connection therewith, revenues shall be reported to each Party by the other on a basis consistent with U.S. GAAP ("generally accepted accounting principles") under the accrual method of accounting (and not on the cash basis of accounting). Without limitation to the foregoing, reporting to each shall be on a per licensee (or other partner) basis and include the information set forth in the reporting template reasonably agreed to by the parties. In accordance with the foregoing, revenues shall include the actual and projected royalties or other revenues reported by the licensee(s) or other partners (on a per licensee or partner basis) for a given quarter including any minimum guarantee or advance applicable with respect to such licensee or other partner covering such period, provided as to the actual revenues (as opposed to the projections), such royalties or guarantees or advances are ever received by the applicable Party.

(j) The relationship between MGA and VMN with respect to the accounting from one party to the other for monies due to one another hereunder is one of "creditor-debtor" and nothing in the Agreement shall make either Party a fiduciary or trustee of the other party. Neither party makes any representation to the other as to the success of either Party's exploitation of its rights hereunder. No party has any security interest, lien or other interest in the receipts of the other party and neither party has any obligation to segregate any funds, provided MGA shall use reasonable commercial efforts to cause Moonscoop to segregate the production budget in a separate bank account specifically for the Programming. Except as set forth in this Agreement, each Party shall have the broadest possible latitude in the exploitation or its respective rights hereunder in the Programming and the Property, and the exercise of each Party's judgment in good faith in all matters pertaining thereto shall be final. In no event shall either Party incur any liability based upon a claim that such Party failed to realize receipts or revenue that could have been realized.

| 8.Promotion-al/ Marketing | (a) Promotional Uses Where Fees Are Not Paid By a Third Party: Each Party will have non-exclusive customary advertising and promotional rights in the Programming, the Property and the Additional Production in all languages, in all media, on any platform (including third party platforms) worldwide including, but not limited to, the right to create up to three new digital games per year to be played on |
|---|---|

619071v2

CONFIDENTIAL

|  | Nickelodeon-branded personal computer and mobile digital platforms, including but not limited to websites and apps (but excluding Lalaloopsy-branded apps and websites, which are reserved to MGA), excerpts (each excerpt not to exceed 2 minutes in length) and other promotional uses based on the Programming, the Property and/or the Additional Production, provided, however, that if fees are paid to the applicable Party for such advertising or promotion, then the terms of 8(b) apply . |
|---|---|
|  | (b) Promotional Uses Where Fees Are Paid By a Third Party:  The parties hereby agree that with respect to advertising, promotions and sponsorships where fees are paid by a third party for said advertising, promotions and sponsorships (herein, the "Paid Promotions"), the following shall apply: |
|  | (i)  MGA shall have the exclusive right to do Paid Promotions, except on or with any VMN-branded content distribution services and platforms (e.g., MGA shall have to right to do promotions with any quick service restaurants); |
|  | (ii)  VMN shall have the exclusive right to do the Paid Promotions on or with any VMN-branded content distribution services and platforms; |
|  | (iii) For any television Paid Promotions undertaken by or on behalf of MGA, MGA shall pay VMN a fee of 30% of the promotional fees paid to MGA for each such Paid Promotion, upon MGA's receipt of the consideration for said Paid Promotion. |
|  | (iv) As to all Paid Promotions, VMN has a right of meaningful consultation in connection therewith (including without limitation as to the applicable sponsors and/or partners) and all such Paid Promotions are subject to Nickelodeon's standards and practices policies. |
| 9.Creative Approvals | VMN shall have customary broadcaster approvals with respect to all key business, financial and creative aspects of the Programming (e.g., without limitation, scripts, budget, production and delivery schedule, key character designs, key background designs, secondary character designs, premises, voice performers, music, key personnel, title, credits).  All such approvals by VMN shall be exercised in good faith and in a timely manner as necessary to meet the production and delivery schedule and budget. In addition, the Programming shall be subject to compliance with Nickelodeon's Standards and Practices policies and for editing for time and space requirements and for compliance with applicable laws, rules and regulations. |
| 10.Addition-al Production | In the event one Party elects to proceed with Additional Production and the other does not, the electing Party may proceed without the other Party, provided that the following terms shall apply:<br><br>(a) Even if MGA is the non-proceeding Party, MGA shall continue to own and control toy rights and Ancillary Rights in the Programming and Additional Production (including Additional Seasons), subject to the revenue share splits set forth below.  Additionally, if MGA is the non-proceeding Party and VMN is the proceeding party, then (i) VMN shall be solely responsible for all costs of production of the Additional Production, (ii) if the Additional Production is Additional Season(s), the budget of the new episodes produced by VMN shall be substantially the same as the budget of the initial 52 Episodes produced hereunder (and any subsequent cycles shall be subject to the 5% cumulative increase per cycle, if any, set forth in paragraph 4(d) above) and the new episodes shall be of the same quality as the initial 52 Episodes produced hereunder, (iii) MGA shall not be required to pay any minimum guarantee with respect to such Additional Production(s) (regardless of the provisions of Paragraph 7(d) above), and (iv) MGA shall have all of the same creative approvals and rights with respect to such Additional Production as it has with the initial 52 Episodes.  All such creative approvals by MGA shall be exercised in good faith and in a timely manner as necessary to meet the production and delivery schedule and budget.<br><br>(b) The Parties shall be entitled to the following revenue share (if and as applicable): |

CONFIDENTIAL

VIA00001527

| | |
|---|---|
| | (i) With respect to the USTP/CB Territory, revenues derived from distribution and/or exploitation of the Programming and/or the Additional Production themselves (e.g., home video/DVD/DTO, syndicated program sales): each Party will continue to receive its respective revenue share as set forth in paragraph 7(e) above, for co-financed episodes of the Programming and Additional Production only (i.e. 75% share to VMN and 25% share to MGA), it being agreed and understood that if VMN finances an Additional Production without MGA, VMN shall retain 100% of all such revenues with respect to USTP/CB Territory and ROW;

(ii) Revenues derived from exploitation of the Ancillary Rights in and to the Programming and/or Property and/or the Additional Production (that is, ancillary revenue where it isn't possible to distinguish said ancillary revenue between co-financed and non-co-financed episodes:  The non-proceeding Party will receive a reduced revenue share whereby the numerator will be the total number of episodes or episode equivalents co-financed by the non-proceeding Party and the denominator will be the total number of episodes or episode equivalents produced in the aggregate, multiplied by the percentage of the revenue share for the non-proceeding Party, as set forth in paragraph 7(c) above (i.e. 70% if MGA is the non-proceeding Party and 30% if VMN is the non-proceeding Party).  Notwithstanding the foregoing, the maximum amount by which MGA can be reduced is to 50% of MGA's 70% revenue share (i.e. to a floor of 35%) that MGA would have received if it had co-produced all episodes, regardless of how many episodes are produced where MGA is not co-financing.

(iii)  Revenues derived from exploitation of toy rights in and to the Programming and/or the Property and/or the Additional Production (that is toy revenues where it isn't possible to distinguish said toy revenues between the  co-financed and non co-financed episodes):  (A) If MGA is the proceeding Party and VMN elects not to proceed, VMN will receive a reduced Royalty, whereby the numerator will be the total number of episodes or episode equivalents co-financed by VMN and the denominator will be the total number of episodes or episode equivalents produced in the aggregate, multiplied by 4%; and (B) if MGA is the non-proceeding Party, neither Party's share of the Royalty as provided in 7(b) above will be reduced, and MGA shall continue to receive the toy revenues set forth in paragraph 7(b) above, and VMN shall continue to receive the Royalty set forth in 7(b) above.

 (c) In the event VMN does not proceed with Additional Production, MGA will be subject to a 1-year holdback period from the expiration of VMN's First Negotiation/First Refusal Rights as to said Additional Production (or lapse of the applicable option set forth in paragraph 4(d) if an Additional Season) before any such Additional Production  may be broadcast in the United States or in any other territory in the USTP/CB Territory, provided, however, that notwithstanding anything to the contrary, MGA will not enter into any deals for any Additional Production (including without limitation any Subsequent Production, other than as permitted pursuant to paragraph 4(c)(iii) as to the LGF Pictures), or broadcast any Additional Production (including without limitation any Subsequent Production) in the USTP/CB Territory, earlier than 3 years following initial broadcast of the first episode of the Programming in the United States. |
| **11. Backend Forfeiture** | (a) In the event VMN ceases regular airing of the Programming or Additional Production (but notwithstanding anything to the contrary herein, if VMN is regularly airing either or both of the Programming or the Additional Production, then this provision shall not apply) on the main Nickelodeon or the "Nick Jr." television channel for a period of no less than 18 consecutive months, VMN's participation in Ancillary Rights and the Royalty set forth above shall terminate as of completion of the first quarterly accounting period following the expiration of said 18-month period.  Notwithstanding anything to the contrary herein, if VMN is regularly airing on either or both of the main Nickelodeon or the Nick Jr. television channel, then this provision shall not apply. As used herein, "regular airing" or "regularly airing" means airing at least once per week between the hours of 8 a.m. to 9 p.m. Notwithstanding the foregoing, it is agreed and understood that if VMN preempts any such weekly airing, but VMN airs the preempted (or another) episode in the same quarter as said preemption (or next |

CONFIDENTIAL                                                                                    VIA00001528

|  | quarter if preemption is at end of a quarter), between the hours of 8 a.m. to 9 p.m., said airing shall constitute "regular airing" or "regularly airing". |
|---|---|
|  | (b)  If VMN ceases regular airing of the Programming for a period of five (5) consecutive years, then VMN shall thereafter no longer have VMN's First Negotiation/First Refusal Rights as to any Derivative Production initiated following said 5-year period.  In connection with the foregoing, if VMN finances or co-finances at least one Derivative Production, the terms of this paragraph 11(b) shall not be applicable. |
| 12. Delivery of Materials | The delivery materials for the Programming shall be delivered to VMN, as follows:<br><br>(a)  MGA shall deliver each episode of the Programming 8 weeks prior to the intended initial broadcast of said episode by VMN.<br>(b)  The delivery materials for the Programming shall be delivered in accordance with VMN's delivery requirements and production guidelines, which MGA acknowledges has been furnished to MGA.<br>(c)  Grantor will deliver the Programming to VMN in the English language. |
| 13.Owner-ship | MGA will retain sole ownership and copyright in and to the Property, including without limitation, in and to the names "Lalaloopsy" and Lala-oopsies" and any other names, characters, pets and worlds created for the Property (as opposed to created for the Programming or for Additional Production) and all trademark rights related thereto.  VMN and MGA will jointly own all intellectual property in and to the Programming and any Additional Production co-financed by the Parties, and a Party hereto will solely own all intellectual property in and to any Additional Production that such Party has funded without the other Party (in each case, other than the Property to the extent incorporated in the Programming or in any Additional Production, including the title, if "Lalaloopsy" is used as the title, in connection with which MGA hereby grants VMN all necessary rights and licenses to use said Property (including the title) in connection with VMN's distribution, exhibition and exploitation of the Programming and such Additional Production, it being agreed and understood that the foregoing is without limitation to the exclusive grant of rights hereunder to VMN in and to the VMN Rights), and all rights therein and all elements thereof, including without limitation, the copyrights and trademarks related thereto. |
| 14. Press Releases | VMN shall meaningfully consult with MGA about the initial press release regarding the Programming in the USTP/CB Territory.  Otherwise, each Party shall control press releases and publicity regarding the exploitation of their respective rights hereunder and will consult with each other about the timing of such releases. |
| 15. Geofiltering | In accordance with the then prevailing commercial practices of distributors delivering and exhibiting audiovisual content via the Internet in the applicable territory, as determined on a platform-by-platform basis, both Parties shall use geo-filtering technology intended to prevent, and reasonably designed to effectively prevent, a person outside their authorized territory from accessing the display via the Internet of the Programming.  In furtherance of the foregoing, both Parties shall use commercially reasonable efforts to cause each of its sublicensees to use such geofiltering technology in accordance with this paragraph, as applicable. |
| 16. Confident-iality | Each Party recognizes and acknowledges that it may receive certain confidential information concerning the other Party's business and affairs during the course of the Parties' relationship hereunder, provided that such confidential information will not include information that is or becomes generally available to the public other than as a result of a disclosure in violation of this Agreement or becomes available on a non-confidential basis from a source entitled to disclose it. The Parties each agree that they will not disclose to any third party any such information relating to the other Party or its personnel or operations, the terms of this agreement or any plans relating to the Property, Programming or Additional Production, except as may be required in the performance of each Party's respective obligations hereunder on a need-to-know basis, or in any way use such information in any manner which could adversely affect the other Party's business.  The foregoing shall not apply to i) such disclosures as may be required by law (and in such case the Party making the disclosure shall seek confidential |

619071v2

Ex. B  Page 18

| | |
|---|---|
| | treatment of such information); ii) as may be necessary to establish or enforce a Party's rights hereunder; or iii) in connection with any disclosure required by or to a Party's auditors, accountants, financial advisors, attorneys or agents, provided that such persons are subject to the terms of this provision. |
| 17. Represent-ations and Warranties and Indemnities | Each Party represents and warrants that it has the right to enter into and fully perform the obligations set forth in this Agreement. MGA represents and warrants that (a) the Programming and the Property is and shall be wholly original with MGA (except for material that is in the public domain throughout the USTP/CB Territory) or fully cleared by MGA in the USTP/CB Territory; (b) MGA has the right to grant the rights granted to VMN herein, and hereby grants all rights necessary for VMN's exhibition of the Programming and the Property (including without limitation the title, "Lalaloopsy"), including without limitation all necessary literary, artistic, musical synchronization and/or intellectual property rights (including, without limitation, a trademark license hereby granting VMN all necessary trademark rights to use and exploit the title "Lalaloopsy" in connection with the rights granted to VMN hereunder) and/or licenses (except VMN shall obtain the applicable music public performance licenses, e.g. from ASCAP or BMI, in connection with VMN's exhibition of the Programming); (c) neither the Programming, nor the Property, nor the exercise by VMN of the rights granted herein will infringe on any rights of any party, including but not limited to copyright, trademark, unfair competition, contract, defamation, privacy or publicity rights; and (d) no payments (including, without limitation, any fees, royalties, reuse, residual or purchase payments) shall be due by VMN to any parties in connection with VMN's exploitation of the Programming and/or the Property other than to (i) MGA, as specifically provided herein; and (ii) as to any public performance royalties for music (e.g., ASCAP, BMI) for VMN's exhibition of the Programming in the USTP/CB Territory.

Each Party hereto shall indemnify, defend and hold harmless the other Party (and its affiliates, officers, agents, employees, directors, subsidiaries and licensees from and against any and all claims, liabilities, damages, costs and expenses (including, without limitation, reasonable outside attorneys' fees) arising from a breach of its respective representations, warranties and/or obligations set forth in this Agreement. |
| 18. Assignment | Neither Party to this Agreement may assign any of its rights hereunder, or delegate any of its obligations hereunder, without the prior written consent of the other Party, except as otherwise expressly provided herein. Notwithstanding the foregoing, either Party may assign this Agreement or any of its rights hereunder, and delegate any of its obligations hereunder, without the other Party's consent as part of a merger, consolidation, corporate reorganization, sale of all or substantially all of such Party's assets, sale of stock, change of name or like event. Any assignment or purported assignment in violation of this Agreement shall be null and void. Subject to the foregoing, this Agreement shall inure to the benefit of and shall be binding on and enforceable by the Parties and their respective successors and permitted assigns. |
| 19. No Injunctive Relief | In the event of a breach or alleged breach of this Agreement by a Party hereto, the other Party hereto shall be limited to its remedies at law for actual monetary damages, if any. In no event shall a Party hereto have the right to enjoin or restrain the development, production, distribution, exhibition or exploitation of the Property, the Programming, the Ancillary Rights, the VMN Rights or any Additional Production whether in or outside of the USTP/CB Territory. |
| 20. Governing Law | This Agreement shall be governed and construed in accordance with the internal laws of the State of California applicable to contracts entered into and fully performed therein and the parties consent and agree to the exclusive jurisdiction and venue of the State and Federal Courts having jurisdiction over Los Angeles County, California with respect to any action that any Party desires to commence arising out of or in connection with this Agreement or any breach or alleged breach of any provision hereunder; and the parties waive any objection as to improper venue or that any state or federal court of California is an inconvenient forum. |

619071v2

Ex. B  Page 19

CONFIDENTIAL                                                      VIA00001530

| 21. Miscellane-ous | The Parties intend to enter into a long-form agreement incorporating the provisions hereof together with those terms and conditions customarily found in agreements of this type. Until such time, if ever, as a more formal agreement is entered into, this Agreement constitutes a complete and binding contract, and supercedes any prior agreements, negotiations or understandings (written or oral) between the Parties regarding the subject matter hereof and shall be binding upon and inure to the benefit of the Parties hereto and their respective successors, representatives, assignees and licensees as permitted hereunder. This Agreement may not be modified except by a written instrument executed by all Parties hereto. In entering into this Agreement, the Parties agree that they have not relied upon any promise or understanding (written or oral) not contained herein. In the event any provision of this Agreement is held to be invalid or in violation of any law, statute, regulation, court order or collective bargaining agreement, this Agreement shall be deemed modified to the minimum extent required in order to comply therewith and shall otherwise continue in full force and effect. Paragraph headings and word highlighting are for convenience only and shall have no substantive effect on this Agreement. This Agreement may be executed in one or more separate counterparts, each of which, when executed, shall be deemed to be an original, and such counterparts shall, together, constitute and be one and the same agreement. A photocopy of a signature or a facsimile or digital copy of a signature shall be treated as an original. |

AGREED TO AND ACCEPTED:

**MGA Entertainment**

**Viacom Media Networks,**
**a division of Viacom International Inc.**

By: _Bryah Luthu_

Title: _COO_

By: _Sarah Levy_

Title: _COO Nickelodeon_

619071v2

Ex. B  Page 20

CONFIDENTIAL

VIA00001531

### EXHIBIT A
### CHARACTER VOICES / VOICE TRACK EXPLOITATION GUIDELINES

VMN shall have the right in perpetuity to exhibit the full Episodes (or to edit an Episode into two (2) approximately 11 minute Episodes and exhibit them independently or consecutively) incorporating the character voices as synchronized to picture as delivered to VMN by MGA, in the following "**Audio-Visual Media**":

> Free Television
> Cable Television
> Pay Television
> Theatrical
> Video (as defined below)
> Interactive media (as defined below), all formats
> Internet, Transportation and Mobile

**"Interactive Media"** means the exploitation of the Episodes in any and all media formats such as, but not limited to, CD-Rom, promotional digital games, DVD, and other compact devices.   However, VMN may not use the voice tracks from any Episode within any digital game except as such voice tracks are synchronized to picture as contained in the Episodes delivered by MGA to VMN.

"**Video**" use means the distribution of the Programming or any Additional Production or portion thereof by manufacturing and selling or renting copies of a Production on tape, disc, cassette or any other format intended primarily for private, in-home use.

In no event can the character voices be separated from the picture of the Episodes in connection with the exploitation of the Episodes in any of the Audio Visual Media set forth above (including without limitation in digital games), unless otherwise agreed to by CLAC.

Episode Excerpt – Excerpts of not more than five (5) minutes in length, may be used as a trailer, Episode insert, or promo for the Episodes or the series for which the Episodes form a part, including use in an awards program for the promotion of an Episode or Episodes within the series from which the excerpt has been taken.  Such excerpts or clips may be used within the series for recaps, previews or teasers without additional payment. All Episode Excerpts may be used in any of the above referenced audio-visual media, provided that the excerpts are used for the above referenced purposes pertaining to the applicable Episode or the series of Episodes in which the Episodes form a part.

The voices from the Episodes shall not be used in any audio-visual program or use except in the Episode within which such voices are contained, or the advertising or promotion for the Episodes, the Programming, or Additional Seasons, as such voices are synchronized to the final picture of the applicable Episode as delivered to VMN hereunder.

619071v2

Ex. B  Page 21